**[Cite as *State v. Tope*, 2020-Ohio-953.]**

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2019-CA-11 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-0608 |
| | : | |
| LELAND G. TOPE | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 13th day of March, 2020.

. . . . . . . . . . .

MARCY VONDERWELL, Atty. Reg. No. 0078311, Assistant Prosecuting Attorney, Greene County Prosecutor's Office, 61 Greene Street, Suite 200, Xenia, Ohio 45385
    Attorney for Plaintiff-Appellee

CHARLES M. BLUE, Atty. Reg. No. 0074329, 401 East Stroop Road, Kettering, Ohio 45429
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

TUCKER, P.J.

{¶ 1} Defendant-appellant, Leland G. Tope, appeals from his convictions for one count of involuntary manslaughter, one count of trafficking in heroin and one count of possession of heroin. Raising two assignments of error, Appellant argues that his conviction for involuntary manslaughter should be reversed because the State did not produce sufficient evidence to prove his guilt, and that all three of his convictions should be vacated because he was not brought to trial within 270 days of his arrest, as required by R.C. 2945.71. We find that the State introduced sufficient evidence to prove Appellant's guilt with respect to each of the elements of involuntary manslaughter, and further, that Appellant's right to a speedy trial was not violated. Therefore, Appellant's convictions are affirmed.

### I. Facts and Procedural History

{¶ 2} At 11:59 p.m. on July 17, 2017, the Xenia Greene Central Communications Center received a call for medical assistance from the residence of Mark Tope, Appellant's brother, on Stevenson Road in Xenia Township. *See* Trial Transcript, 229:17-229:24, 233:9-233:12 and 238:18-239:8, Feb. 11-13, 2019. The first of the emergency personnel to reach the scene was Deputy William Coe of the Greene County Sheriff's Department, who arrived at 12:04 a.m. *Id.* at 256:4-256:17. He had been informed en route that the caller reported a possible overdose and was attempting to resuscitate the victim. *Id.* at 256:15-256:21 and 260:12-260:22.

{¶ 3} When Deputy Coe entered the residence, he encountered Appellant's sister-in-law and brother-in-law, who did not know why he was there. *Id.* at 257:3-258:2. Appellant appeared moments later at the top of the stairway leading to the basement of

the residence, beckoning the deputy to join him. *Id.* at 258:23-259:7. Once in the basement, the deputy saw Mark Tope lying on his back on the floor. *Id.* at 260:1-260:6.

{¶ 4} Deputy Coe's first aid kit included an automated external defibrillator. *Id.* at 260:12-260:22. The deputy attached the device's electrode pads to Mark's chest, but the device reported that administration of electric shock was contraindicated. *See id.* at 261:2-262:25. At that point, paramedics arrived; the time was approximately 12:06 a.m. *Id.* at 261:19-261:25 and 315:4-315:6. The paramedics attempted to resuscitate Mark and administered Narcan, but without success.[1] *Id.* at 315:12-323:24. At approximately 12:13 a.m., they notified their dispatchers that Mark had died. *See id.* at 323:25-325:15 and State's Exhibit 3.

{¶ 5} Afterward, Deputy Coe examined the basement and spoke with Appellant. *Id.* at 262:16-264:22, 266:12-269:6, 274:23-276:6, 688:3-689:6, 695:17-696:25 and State's Exhibit 4. Appellant admitted that he had purchased a material purported to be heroin at Mark's request, explaining that he gave Mark one dose contained in a gelatin capsule. *See id.* The deputy found an empty gelatin capsule, and the Bureau of Criminal Investigation later determined that the small amount of residue remaining in the capsule was heroin. *Id.* at 275:16-276:2, 506:21-507:10 and 511:12-512:20. No fingerprints were obtained, and Appellant told Deputy Coe that the other capsules had been flushed down a toilet. *See id.* at 280:1-280:10, 364:2-364:5 and 675:1-678:3. An autopsy revealed that Mark's cause of death was "acute intoxication by [c]arfentanil,

---

[1] Deputy Coe had been unable to administer Narcan because, at the time, the personnel of the Greene County Sheriff's Department had not yet been issued Narcan as a standard component of their first aid kits. Trial Transcript, 259:15-259:25.

[f]entanyl, fluorobutyrylfentanyl, and ethanol." *Id.* at 447:4-447:7.

{¶ 6} On October 20, 2017, a Greene County grand jury indicted Appellant as follows: Count 1, involuntary manslaughter, a first-degree felony pursuant to R.C. 2903.04(A) and (C); Count 2, trafficking in heroin, a fifth-degree felony pursuant to R.C. 2925.03(A)(1) and (C)(6)(a); Count 3, possession of heroin, a fifth-degree felony pursuant to R.C. 2925.11(A) and (C)(6)(a); and Count 4, tampering with evidence, a third-degree felony pursuant to R.C. 2921.12(A)(1) and (B).[2] Appellant's trial began on August 20, 2018, but on August 21, 2018, Appellant's counsel moved to have Appellant evaluated for competency to stand trial, prompting the trial court to hold a hearing. Following the hearing, the court filed an entry on August 24, 2018, in which it "found by a preponderance of the evidence that [Appellant was] ha[ving] difficulty in assisting [counsel with] his defense." As a result, the court declared a mistrial and ordered a competency evaluation.

{¶ 7} Appellant was subsequently deemed competent to stand trial, and at his second trial, which began on February 11, 2019, he elected to represent himself. The jury found him guilty on Counts 1 through 3, and not guilty on Count 4. On February 28, 2019, the trial court sentenced Appellant to serve concurrent terms of four years in prison for the offense of involuntary manslaughter and 12 months for the offense of trafficking in heroin, with Appellant's conviction for possession of heroin being merged with his conviction for trafficking. Judgment Entry 1-4, Feb. 28, 2014. Appellant timely filed a notice of appeal to this court on March 25, 2019.

---

[2] We refer to those versions of R.C. 2925.03 and 2925.11 which were in effect from September 14, 2016, through October 30, 2018.

## II. Analysis

**{¶ 8}** For his first assignment of error, Appellant contends that:

APPELLANT'S CONVICTION FOR INVOLUNTARY MANSLAUGHTER IS NOT SUPPORTED BY SUFFICIENT EVIDENCE TO PROVE GUILT BEYOND A REASONABLE DOUBT.

**{¶ 9}** Appellant posits that where a defendant is charged with trafficking in a certain controlled substance, the trafficking offense may not serve as the predicate offense for a charge of involuntary manslaughter unless the decedent's death was proximately caused by the same controlled substance. *See* Appellant's Brief 13-15. In reliance on this proposition, Appellant argues that the State did not produce sufficient evidence to prove him guilty of involuntary manslaughter because the State failed to produce any evidence that heroin was the proximate cause of his brother's death. *Id.* at 11-12.

**{¶ 10}** Sufficiency of the evidence "is the legal standard applied to determine whether * * * the evidence [in a given case] is [adequate] as a matter of law to support the * * * verdict." *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). On review of a challenge to a conviction based upon the sufficiency of the evidence, the " 'relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *Id.*, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶ 11}** According to Appellant, this court "has previously [held] that a conviction for possession of a specific controlled substance requires proof that the drug involved * * *

was in fact that specific controlled substance." Appellant's Brief 14-15, citing *State v. Pendleton,* 2d Dist. Clark Nos. 2017 CA 9 & 2017 CA 17, 2018-Ohio-3199, ¶ 30, *appeal accepted,* 154 Ohio St.3d 1443, 2018-Ohio-4962, 113 N.E.3d 551.[3] He maintains that the "same rationale must apply to the predicate offense [for a charge of] involuntary manslaughter," meaning that if the predicate offense is "trafficking in heroin, then there must be sufficient proof adduced that heroin is[,] at a minimum[,] a substantial factor in causing the death of the victim." *Id.* at 15. Hence, he "concedes that there was sufficient evidence presented [at trial] to sustain his conviction for trafficking in heroin," but he emphasizes that the Montgomery County Coroner determined his brother's cause of death to be "acute intoxication by [c]arfentanil, [f]entanyl, fluorobutyrylfentanyl, and ethanol." *Id.* at 12-13; Trial Transcript, 447:4-447:7.

**{¶ 12}** The eponymous appellant in *Pendleton* was convicted, among other things, of trafficking in a mixture that contained heroin and fentanyl. *See Pendleton* at ¶ 8-10. In that part of the opinion to which Appellant refers, we considered whether trafficking in a mixture of heroin and fentanyl should be treated as a single offense, as two offenses subject to merger pursuant to R.C. 2941.25(A), or as two offenses not subject to merger pursuant to R.C. 2941.25(B). *See id.* at ¶ 29-30. We held that trafficking in a mixture of heroin and fentanyl should be treated as two offenses not subject to merger because a conviction for trafficking in heroin "require[s] proof that the 'drug involved in the violation

---

[3] Appellant inaccurately indicates that we cited *State v. Delfino,* 22 Ohio St.3d 270, 490 N.E.2d 884 (1986), and *State v. Huber,* 2d Dist. Clark No. 2010-CA-83, 2011-Ohio-6175, in support of the principle he attributes to the *Pendleton* opinion. The citations to *Delfino* and *Huber,* however, related to the merger of allied offenses, rather than to the burden of proof in possession or trafficking cases. *Pendleton* at ¶ 29-30.

[was] heroin <u>or a compound, mixture, preparation, or substance containing heroin</u>,' " whereas a "conviction for trafficking in fentanyl require[s] proof that the 'drug involved in the violation [was] any compound, mixture, preparation, or substance included in [S]chedule I or [S]chedule II, with the exception of * * * heroin.' "[4]   (Emphasis added.) *See id.* at ¶ 30, quoting R.C. 2925.03(C)(1) and 2925.11(C)(6).[5]   Thus, as the context illustrates, Appellant's characterization of the *Pendleton* opinion is not entirely accurate.

{¶ 13} Moreover, R.C. 2925.03(C)(6) establishes that a person who violates R.C. 2925.03(A) "is guilty of trafficking in heroin" if "the drug involved in the violation is heroin <u>or a * * * mixture * * * containing heroin</u>."   (Emphasis added.)   A "mixture" is a "blending of several ingredients without * * * alteration * * *, [such that] each [ingredient] retains its own nature and properties," in contrast to a "combination, in which the [ingredients] unite by chemical attraction, and, losing their distinct properties, form a [single] compound differing in its properties from [those of] any of the ingredients."   (Emphasis omitted.) *Webster's New Twentieth Century Dictionary* 1079 (1964).   Therefore, selling or offering to sell a mixture containing heroin would be no less a violation of R.C. 2925.03(A)(1) and (C)(6) than selling or offering to sell pure heroin, regardless of whether the mixture's other

---

[4] The excerpt from *Pendleton* quoted above related to the majority's consideration of whether trafficking in a mixture of two or more controlled substances should be merged for purposes of sentencing, or treated as separate offenses.   Regardless of whether the Ohio Supreme Court reverses our holding in *Pendleton*, Tope mischaracterizes the discussion, which referred abstractly to the elements of trafficking in heroin and trafficking in fentanyl for purposes of an allied offense analysis.   In *Pendleton*, we were not asked to consider whether a defendant could properly be convicted for trafficking in a specific controlled substance in the absence of proof that the material being trafficked was, in fact, the specified substance.

[5] R.C. 2925.11 has since been revised more than once, but the language we quoted in Paragraph 30 of the *Pendleton* opinion has not been changed.   *Compare Pendleton* at ¶ 30, *with* R.C. 2925.11(C)(1) and (C)(6).

components were inactive fillers or additional controlled substances, such as carfentanil and fentanyl. For that matter, a defendant could be convicted of violating R.C. 2925.03(A)(1) and (C)(6) for selling or offering to sell a material that contained no heroin at all, so long as the defendant believed that the material was heroin. *See, e.g., State v. Chandler*, 109 Ohio St.3d 223, 2006-Ohio-2285, 846 N.E.2d 1234, ¶ 9 (stating that "[u]ndoubtedly, a person can be convicted for offering to sell a controlled substance in violation of R.C. 2925.03(A)(1) without actually transferring a controlled substance to the buyer").

{¶ 14} To prove Appellant guilty of trafficking in heroin pursuant to R.C. 2925.03(A)(1) and (C)(6), then, the State had to present evidence showing that he sold, offered to sell, or gratuitously delivered to his brother a material that he believed to be heroin, irrespective of the actual composition of the material.[6] *See* R.C. 2925.03(A)(1) and (C)(6); *Chandler* at ¶ 9. Appellant has conceded that the State proved as much. Appellant's Brief 12. In turn, to prove Appellant guilty of involuntary manslaughter under R.C. 2903.04(A), the State had to present evidence showing that his brother died as a proximate result of his violation of R.C. 2925.03(A)(1) and (C)(6). *See* R.C. 2903.04(A).

{¶ 15} Appellant based his defense on the theory that Mark Tope had died by suicide, having independently acquired carfentanil for that purpose. *Id.* at 675:15-676:16. In the narrative testimony he offered in lieu of a conventional direct examination,

---

[6] The "word 'sale,' as used in R.C. 2925.03(A)(1), is broadly defined to include delivery, barter, exchange, transfer, or gift." *State v. Bradshaw*, 4th Dist. Scioto No. 17 CA 3803, 2018-Ohio-1105, ¶ 70; *see also* R.C. 2925.01(A) and 3719.01(AA); *State v. Bailey*, 8th Dist. Cuyahoga No. 97330, 2012-Ohio-3356, ¶ 46, fn.1, citing *State v. Grier*, 5th Dist. Stark No. 2010 CA 0024, 2011-Ohio-3815, ¶ 22.

Appellant admitted that he illicitly purchased "a bulk amount" of a material purported to be unadulterated heroin; that he "suppl[ied] [Mark] with a single dose" of the material, contained in a gelatin capsule he filled himself; and that Mark consumed the contents of the capsule. Trial Transcript 662:6-662:9, 683:13-683:16, 695:17-696:25, 703:18-704:3 and 735:21-736:14. By this account, Appellant arrived at his brother's house at approximately 10:45 p.m. on July 17, 2017, and his brother consumed the capsule "as soon as [he] got there."[7] *Id.* at 736:22-737:15 and 740:19-741:9. The two then listened to "one side" of an unspecified Simon & Garfunkel album, drank whisky and had a conversation. *See id.* at 674:7-674:25, 767:1-768:1 and 791:11-792:2. Mark entered a bathroom, which apparently was also in the basement, and according to Appellant's theory, consumed carfentanil; when Mark emerged, he sat down "and passed right out." *See id.* at 768:2-768:16. Appellant tried to revive Mark for 20 minutes using cardiopulmonary resuscitation ("CPR"), after which he called 911 for emergency assistance; his call was received at 11:59 p.m. *Id.* at 238:18-239:8, 678:12-678:22 and 742:1-744:12.

{¶ 16} On cross-examination, the State asked Appellant why he did not immediately call 911, and Appellant answered that because Mark still had a pulse after losing consciousness, and because he "had revived [Mark's] breathing" with CPR, he thought that emergency assistance would not be necessary. *See id.* at 742:1-744:5. Appellant thereafter decided to call 911 "when [Mark] stopped breathing[,] and his pulse failed." *See id.* at 743:19-744:15.

---

[7] Appellant told the paramedics that he had arrived at 10:30 p.m., which roughly corresponds to his trial testimony. *Id.* at 326:5-327:16.

**{¶ 17}** Yet, in a written statement he made at or around 12:47 a.m. on July 18, 2017, Appellant said he had "arrived [at his brother's house] at 11:45." Trial Transcript 265:6-267:8 and State's Exhibit 4. Appellant acknowledged in the statement that his brother had "asked [him for] a dose of opiates[,] i.e. [h]eroin[,] knowing that he [would] know in Dayton where to get it," and he explained that "[s]hortly after ingesting [t]he [d]rug[,] [Mark] passed out," at which point he "began giving mouth[-]to[-]mouth."[8] *Id.* at State's Exhibit 4. He indicated, as he later did at trial, that Mark's pulse was initially "strong" but failed, after which he called 911. *Id.*

**{¶ 18}** When the paramedics reached Mark's house at approximately 12:06 a.m., however, they examined Mark and observed lividity, which suggested to them that Mark must have "been down for quite a while." *See* Trial Transcript 315:4-315:6 and 319:16-322:9. Dr. Kevin Sharrett, the Greene County Coroner, testified that the paramedics' observation of lividity established that Mark must have been dead for "at least 30 minutes" at that point, and his "best estimate" was that Mark had died "between 30 and 60 minutes prior to the [paramedics'] arrival." *Id.* at 558:8-561:11. He added that the use of CPR would have had no effect on the appearance of lividity.[9] *Id.* at 575:1-575:16. Given that the paramedics examined Mark between 12:06 a.m. and 12:13 a.m., the import of Dr. Sharrett's testimony is that Mark died between 11:06 and 11:43 p.m.[10] *See id.* at 324:24-

---

[8] At trial, the State asked Appellant what he had meant by the word "shortly" as he used it in his written statement, and Appellant answered "[w]ithin the hour." Trial Transcript 809:16-810:15.

[9] The Montgomery County Coroner testified that the autopsy confirmed that Mark Tope had received CPR, but the evidence did not indicate whether he was still alive at the time. Trial Transcript 490:7-491:13.

[10] Mark Tope's official time of death was reported by the Greene County Coroner as

325:19 and State's Exhibit 3. This seems to preclude the possibility that Appellant arrived at his brother's house as late as 11:45 p.m.

{¶ 19} Regardless of the exact time Appellant arrived at his brother's house, the evidence left the jury to decide which of two scenarios was the true explanation of Mark Tope's death: (1) Appellant's theory that Mark died by suicide after intentionally overdosing on carfentanil; or (2) the State's theory that the material with which Appellant provided Mark contained carfentanil. Appellant argued that the results of Mark's autopsy proved his theory because no heroin metabolites were found in Mark's blood, yet the empty gelatin capsule recovered by Deputy Coe tested positive only for heroin. *See id.* at 419:21-422:1 and 677:5-677:19; *see also* Appellant's Brief 13. As further proof, Appellant claimed that he consumed "four times the amount" of the same material that Mark consumed, but without suffering any adverse effects. *See id.* at 683:12-683:21 and 686:2-686:5. He also insisted that he could be confident that he had supplied Mark only with unadulterated heroin because his "connection" for purchasing the drug "had the real thing," which he could confirm based on his previous experience using heroin supplied by that same person. *See id.* at 698:1-699:6 and 703:18-704:3.

{¶ 20} For its part, the State presented evidence showing that heroin is, or was at the relevant time, often mixed with other drugs such as fentanyl and carfentanil. *See id.* at 342:12-344:5, 466:11-469:1 and 514:13-515:2. Although no heroin metabolites were found in Mark's blood, the chief toxicologist for the Montgomery County Coroner testified

---

12:15 a.m. on July 18, 2018. Trial Transcript 541:22-541:25, 550:9-551:17 and State's Exhibit 27. The coroner testified that 12:15 a.m. "was the time that [he] used for the [coroner's] [v]erdict and for the [d]eath [c]ertificate" because the paramedics discontinued their efforts to resuscitate Mark at that time.

that Mark could have consumed an amount of heroin too small to result in the detection of the corresponding metabolites, and Appellant himself testified that he had "made sure [that Mark] just had the smallest amount possible." *Id.* at 419:21-422:1 and 695:22-696:9. Addressing the analysis of the residue found in the empty gelatin capsule, a forensic scientist from the Bureau of Criminal Investigation testified that the sample was insufficient to permit a determination of whether the capsule had contained anything other than heroin. *See id.* at 517:6-517:24.

{¶ 21} Nevertheless, the State's evidence showed that even a trace amount of carfentanil would have been sufficient to cause Mark's death. The Greene County Coroner testified that "[t]here is no safe amount of [c]arfentanil," and the Montgomery County Coroner described carfentanil as "an immensely powerful * * * product in a very small volume," estimating it to be many times more potent than heroin.[11] *See id.* at 455:17-456:11 and 576:12-577:11.

{¶ 22} Appellant concedes that the State proved him guilty of trafficking in heroin, and he admits that he provided his brother with a material that he believed to be heroin. Thus, with respect to the charge of involuntary manslaughter, the State had to prove that Mark Tope died as a proximate result of consuming the material he received from Appellant. The State's evidence was largely circumstantial, but circumstantial evidence "has the same probative value as direct evidence," meaning that circumstantial evidence " 'is sufficient to sustain a conviction if [it] would convince the average [person] of the

---

[11] Dr. Kent Harshberger, the Montgomery County Coroner, compared the potency of carfentanil, fentanyl and heroin to that of morphine, testifying that carfentanil "is 10,000 times stronger," that fentanyl "is about 50 times stronger," and that heroin "is about four times stronger." Trial Transcript 455:21-456:8.

defendant's guilt beyond a reasonable doubt.' " *State v. Robinson*, 10th Dist. Franklin No. 17AP-5, 2018-Ohio-1809, ¶ 20, quoting *State v. Heinish*, 50 Ohio St.3d 231, 238, 553 N.E.2d 1026 (1990). Here, the jury could have reached only one of two conclusions based on the evidence before it—either Mark independently acquired carfentanil with the intention of dying by suicide, or the material Appellant supplied to Mark contained at least a trace quantity of carfentanil.

{¶ 23} Appellant's testimony could have been sufficient to inspire reasonable doubt in the minds of the jurors, if the jurors had accepted his testimony as credible. Appellant, however, gave the jury several reasons to doubt his credibility. For instance, despite theorizing that Mark died by suicide, Appellant did not clarify what Mark's motive might have been, and although Deputy Coe and one of the paramedics testified that Appellant told them at the scene that Mark had never previously used heroin, Appellant claimed at trial that Mark had previously used heroin "maybe half a dozen times." *See* Trial Transcript 268:12-268:20, 327:24-328:1 and 654:3-660:4. Appellant dismissed the contradictory testimony as perjury, though at one point during cross-examination, he appeared to contradict himself by stating that Mark had had no previous experience with heroin. *Id.* at 731:3-731:17 and 803:8-806:9. Attempting to account for the inconsistencies between his trial testimony and his earlier written statement, Appellant emphasized that he was an "addict" who "was under the influence of heroin at [the] time" he executed the statement, yet he also claimed to be "perfectly normal" and "lucid" while interacting with Deputy Coe and the paramedics that night. *Id.* at 683:7-683:25, 696:20-696:25, 700:4-700:17 and 758:18-760:12.

{¶ 24} Perhaps the most definitive source of doubt about the credibility of

Appellant's testimony was the testimony offered by the Greene County Coroner, Dr. Sharrett, who determined that Mark Tope died between 11:06 p.m. and 11:43 p.m. on July 17, 2017, based on the lividity observed by the paramedics; Dr. Sharrett noted that lividity would have required at least 30 minutes to occur and would have begun to appear only after Mark's heart had stopped beating. *See id.* at 558:8-561:11. Appellant, on the other hand, testified that he administered CPR for approximately 20 minutes running from the time that Mark lost consciousness until the time that Mark's pulse failed—the latter being only "a few minutes" before Appellant called for emergency assistance at 11:59 p.m. *Id.* at 678:12-678:22 and 742:1-744:12.

{¶ 25} Viewing the evidence "in a light most favorable to the prosecution," we find that the State presented sufficient evidence to prove beyond a reasonable doubt that Mark Tope died as a proximate result of consuming an illicit substance trafficked to him by Appellant. *Smith*, 80 Ohio St.3d at 113, 684 N.E.2d 668. Appellant's conviction for trafficking in heroin did not necessarily require proof that the substance itself was, in fact, heroin, nor did the absence of a detectible quantity of carfentanil in the heroin residue recovered from the empty gelatin capsule prove that the material with which Appellant provided Mark did not contain carfentanil. Although a significant portion of the State's evidence was thus circumstantial, such evidence is sufficient to support a conviction. Appellant's first assignment of error is overruled.

{¶ 26} For his second assignment of error, Appellant contends that:

THE TRIAL COURT ERRED AS A MATTER OF LAW BY OVERRULING APPELLANT'S MOTION TO DISMISS ON THE BASIS OF SPEEDY TRIAL GROUNDS.

**{¶ 27}** Appellant argues that the trial court erred by failing to sustain his motion to dismiss because the court granted the State's motion for a continuance, which extended the date of Appellant's first trial more than 270 days beyond the date of his arrest, in the absence of any "tolling event [that was] attributable to [him] or [was otherwise] reasonable and necessary."[12]   Appellant's Brief 15.   The State moved for a continuance because a key witness, the Montgomery County Coroner, was unavailable for the date originally set for Appellant's first trial, and the trial court held that the coroner's unavailability was "good cause" to sustain the motion.   State's Motion to Continue Trial 1, June 8, 2018; Entry and Order Continuing Trial 1, June 13, 2018.

**{¶ 28}** In "an appeal raising a speedy trial issue," the standard of review "is to simply count the days as directed in R.C. 2945.71 et seq." *State v. Stevens*, 8th Dist. Cuyahoga No. 87693, 2006-Ohio-5914, ¶ 32, citing *City of Cleveland v. Seventeenth St. Assn.*, 8th Dist. Cuyahoga No. 76106, 2000 WL 426553, *2 (Apr. 20, 2000), and *State v. Saikus*, 8th Dist. Cuyahoga No. 71981, 1998 WL 108150, *5 (Mar. 12, 1998).   Once "a defendant establishes a prima facie case of a violation of his right to a speedy trial, the burden then shifts to the State to demonstrate [that] the statutory limit was not exceeded by [showing] the time was properly extended pursuant to R.C. 2945.72." *State v. Nichols*, 5th Dist. Richland No. 04 CA 56, 2005-Ohio-1771, ¶ 11, citing *State v. Butcher*, 27 Ohio St.3d 28, 30-31, 500 N.E.2d 1368 (1986).   Under R.C. 2945.72(H), the time in which a defendant must be brought to trial "may be extended" for the "period of any

---

[12] The trial court did not enter a formal decision on Appellant's motion to dismiss, but it was effectively overruled once the court entered its final judgment.   *See, e.g.*, *State v. Wilson*, 8th Dist. Cuyahoga No. 105876, 2018-Ohio-3666, ¶ 5.

reasonable continuance granted other than upon the [defendant]'s own motion." Extensions of trial time "are to be strictly construed against the State" because the right to a speedy trial is constitutionally guaranteed, although a trial court's decision on a motion for a continuance is reviewed for abuse of discretion. *Nichols* at ¶ 11, citing *State v. Singer*, 50 Ohio St.2d 103, 362 N.E.2d 1216 (1977); *State v. Jones*, 2d Dist. Clark No. 2013-CA-118, 2014-Ohio-4605, ¶ 15.

{¶ 29} Appellant maintains that the trial court had "no event [for which it could] properly extend [his] speedy trial time pursuant to R.C. 2945.72," yet this court has held previously that the "unavailability of a key prosecution witness" may constitute a reasonable basis for granting a continuance under R.C. 2945.72(H), if the length of the continuance is also reasonable. (Citations omitted.) *See State v. Lee*, 2d Dist. Montgomery No. 20012, 2004-Ohio-668, ¶ 9; *State v. Sanders*, 8th Dist. Cuyahoga No. 107253, 2019-Ohio-1524, ¶ 28. Here, the date of Appellant's arrest was October 24, 2017, and crediting Appellant with three days pursuant to R.C. 2945.71(E), the State had until July 18, 2018, to bring him to trial.

{¶ 30} On the State's motion, the trial court continued the date of Appellant's first trial from its original date of June 18, 2018, until August 20, 2018, which was 33 days more than the 270 days allowed by R.C. 2945.71(C)(2). Given that Appellant was being tried on charges including involuntary manslaughter, the testimony of the Montgomery County Coroner was critical, if not absolutely necessary, which justified an extension under R.C. 2945.72(H). For that matter, despite the trial court's omission of an express finding that the unavailability of the coroner was the basis for its decision to grant the continuance, the court did expressly indicate that it granted the continuance for the reason

set forth by the State in its motion.[13]  State's Motion to Continue Trial 1; Entry and Order Continuing Trial 1.  The record thereby "affirmatively demonstrates the necessity for [the] continuance and the reasonableness thereof," and the court's decision to grant the continuance should consequently be upheld.  *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 62; *see also State v. Martin*, 156 Ohio St.3d 503, 2019-Ohio-2010, 129 N.E.3d 437, ¶ 19 (citing *Myers* with approval).  Appellant's second assignment of error is overruled.

### III. Conclusion

{¶ 31} We find that the State presented sufficient evidence to support Appellant's conviction on the charge of involuntary manslaughter, regardless of the fact that a significant portion of the evidence was circumstantial.  Furthermore, because we find that the trial court had a reasonable basis for continuing Appellant's first trial, we hold that the court did not abuse its discretion by sustaining the State's motion for a continuance. Therefore, Appellant's convictions are affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and FROELICH, J., concur.


Copies sent to:

Marcy Vonderwell
Charles M. Blue
Hon. Stephen Wolaver

---

[13] The words "time waived" were written in hand on the trial court's entry sustaining the State's motion, but Appellant disputes that he executed a waiver.  Entry and Order Continuing Trial 1.  Because we find that the trial court did not abuse its discretion by granting a continuance, the question of whether Appellant executed a waiver is effectively moot.